[No. 55192-8. En Banc. February 23, 1989.]

THE ESTATE OF BERNARD A. FRIEDMAN, ET AL, *Petitioners*, v. PIERCE COUNTY, *Respondent*.

*Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* by *Timothy J. Whitters* and *Patricia K. Schafer,* for petitioners.

*Joseph F. Quinn* (of *McCormick, Hoffman, Rees, Faubion & Quinn, P.S.*), *Special Deputy Prosecuting Attorney,* for respondent.

BRACHTENBACH, J.—This case concerns a claim for damages by property owners on the ground of an inverse condemnation—a taking or damaging by zoning. The trial court granted summary judgment to defendant Pierce County, holding that plaintiff's action was premature in

that plaintiffs had not exhausted their administrative remedies. The Court of Appeals affirmed. *Estate of Friedman v. Pierce Cy.*, 51 Wn. App. 176, 752 P.2d 936 (1988). We affirm the Court of Appeals, but reject one of its holdings.

The action below was brought by Western Savings and Loan Association, d/b/a WSLA Development Corporation, and by an estate and individuals who are the general partners doing business as Chambers Creek Joint Venture (Venture). WSLA and Venture own parcels of real estate located in a planned unit development (PUD) in Pierce County. Venture alleges an option interest in the WSLA property. Both WSLA and Venture appealed the summary judgment to the Court of Appeals, but only Venture petitioned this court for review of the Court of Appeals decision. There is some uncertainty as to the effect of WSLA's failure to join in the petition for review. The uncertainty arises because the nature of Venture's interest in WSLA's property is described only as an option interest. The parties do not address Venture's status and standing as to that parcel.

As will become clear, the record is inadequate. The "facts" in the record are less than reliable; much of the procedural history, including the applicable zoning, has been gleaned from trial court briefs. We will proceed to the issues decided by the Court of Appeals in this case, which concern applicable procedures, but, as will be apparent, our review of this case is hampered because of the failure of the parties to provide a record from which facts may properly be drawn with certainty.

In 1965 Pierce County adopted a PUD resolution, codified as Pierce County Zoning Code ch. 9.76. Apparently this resolution was repealed in 1973, which repealer we note in the zoning code but which the parties do not address. A month after adoption of the PUD resolution, the County approved the Oakbrook PUD, the PUD within which the land at issue is located. The resolution adopting the Oakbrook PUD incorporated by reference a map, text, and homeowners' agreement. None of these documents is in the

record. At some point, unknown from this record, a substantial amount of land in the PUD was marked on the PUD map as "open space."

In 1973 Venture acquired its property. In 1977 WSLA acquired its property. The exact status of zoning at the time the property was acquired is unclear except as can be inferred from subsequent activities. In any case, by 1982 the land was designated "open space."

In 1982 Venture filed with the County a master application containing three proposals. The first, designated in the pleadings as case Z29–82, sought approval for construction of 48 residential units on a portion of Venture's property. The second component of the application by Venture included all of its property and WSLA's property within the PUD. As noted, the exact nature of Venture's interest in WSLA's property and its present status in relation thereto is unknown. This second proposal, designated case UP10–65, is described in plaintiffs' complaint as alternative requests to both properties. We quote the complaint:

> Defendant County was asked to confirm that the said property was not subject to any overall designation restricting permitted uses and was, in fact, undesignated in previous zoning actions relating to the property. In the alternative defendant Pierce County was asked to designate portions of said property for multi–family development and other portions for single family detached development.

Appellants' Clerk's Papers, at 2–3.

The third proposal in the master application was for approval of a 152–unit multifamily development. That proposal was approved and is not part of this litigation.

Hearings on the application were held before a hearing examiner. Not only is plaintiffs' actual application not in the record, but only 9 pages of the hearing examiner's 35–page report and decision are in the record. The 37 exhibits reviewed by the examiner are not in the record. From the portion of the examiner's decision in the record we derive the following: In case Z29–82, the 48–unit proposal, the

decision was "request denied at this time as submitted
. . ." Denial was based in part on the fact that the pro-
posed development would impact a canyon rim and create
slope stability problems and would impact fishing
resources. The proposal seeking a determination that the
land was not subject to any overall designation restricting
uses or alternatively for designation for multi– and single–
family development, case UP10–65, was also denied. The
hearing examiner concluded that this proposal conflicted
with existing shoreline designations applicable to the land,
and that the proposal conflicted with the PUD's plan for
overall development and stability of the area. The Pierce
County Council affirmed the decisions of the hearing exam-
iner.

No other application for any type of zoning change,
development, or variance respecting the land at issue has
been made by either Venture or WSLA.

The present suit began in 1983. Plaintiffs' amended com-
plaint set forth three distinct claims. Plaintiffs denomin-
ated their first claim a "Petition for Judicial Review and
Adjudication and Issuance of a Writ." They alleged that
the County acted in a manner contrary to law and was
guilty of arbitrary and capricious conduct in denial of
approvals in case Z29–82 (the 48–unit proposal). As part of
that claim they further alleged that

defendant Pierce County acted in a manner contrary to
law and was guilty of arbitrary and capricious conduct in
the determination that plaintiffs' property is classified as
"open space reserve" under the applicable land use regu-
lations of Pierce County in case # UP10–65.

Appellants' Clerk's Papers, at 5.

The second claim was entitled "Petition for Declaratory
Relief." Plaintiffs alleged "[t]hat the sole credible evidence
proves that plaintiffs' property was never designated 'open
space reserve', in accordance with applicable law." Appel-
lants' Clerk's Papers, at 6. Plaintiffs petitioned the court
"to declare that plaintiffs' property is not legally restricted
to its use by the designation 'open space reserve' and that

all county records should be amended to reflect that determination." Appellants' Clerk's Papers, at 6.

Plaintiffs' third claim was for damages resulting from a taking and/or damaging by conduct amounting to inverse condemnation.

When the case came to trial in November 1985, trial was limited by agreement to the first two claims described above, that is, the damages claim was not considered. The trial court concluded that the hearing examiner and the county council did not act arbitrarily or capriciously nor contrary to law. Therefore, the court dismissed the "petition for judicial review" claim and the "petition for declaratory relief" claim, and entered judgment accordingly. The court decreed that nothing in the judgment should be deemed to determine any issue relating to the takings claim. The judgment also reveals that plaintiffs abandoned the appeal of the denial in case Z29–82 (the 48–unit proposal) prior to trial on the first two claims.

Defendant Pierce County, now faced with the takings claim, moved for summary judgment on the ground that "there is no genuine issue as to any material fact respecting the question whether plaintiffs may assert a taking claim prior to filing specific proposals to develop their property." WSLA and Venture opposed the motion, maintaining that it would be futile to submit further development proposals. They submitted deposition testimony from a number of Pierce County officials which tended to show a uniform belief that the land had long been classified as open space and should remain as open space or become a park. In support of its summary judgment motion, the County presented deposition testimony from Pierce County officials indicating that approval or disapproval of any development of the land would depend upon the extent of the modification of the open space and the nature of the development.

The trial court granted the summary judgment motion, reasoning that "there is no genuine issue as to any material fact respecting the question whether plaintiffs' action is premature at this point."

Venture and WSLA appealed the summary judgment, arguing that material issues of fact remained as to whether a consistent policy on the part of the County prevented approval of any development and as to whether there has been a final and authoritative decision by the County such that submission of a proposal would be futile. They also argued that a specific development proposal need not be submitted where it would be futile to do so.

The Court of Appeals affirmed the summary judgment, holding that the takings claim is premature. The court also held that to establish that factual circumstances are such that exhaustion of administrative remedies is excused under the futility exception, a landowner must establish futility by uncontroverted evidence. The court held that the question of futility is for the trial court and not for the jury. Venture petitioned for review.

Exhaustion of administrative remedies is generally required before resort to the courts, but exhaustion is excused if resort to administrative procedures would be futile. *South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wn.2d 68, 74, 677 P.2d 114 (1984); *Zylstra v. Piva*, 85 Wn.2d 743, 539 P.2d 823 (1975). In *Orion Corp. v. State*, 103 Wn.2d 441, 693 P.2d 1369 (1985) (*Orion* I), the court recognized that the futility exception to the doctrine of exhaustion of administrative remedies may apply not only in cases where administrative remedies are *legally* inadequate, but also where those remedies are *factually* inadequate. The court said that "futility addresses more than a direct showing of bias or prejudice on the part of discretionary decisionmakers. While rare, futility can be demonstrated by the factual circumstances of a particular case." *Orion* I, at 458. On the record in *Orion* I, the court found that it would be futile for the Orion Corporation to seek a development permit from the county because the creation of an estuarine sanctuary next to Orion's property and de facto inclusion of Orion's property would require denial of any permit under the extensive applicable regulatory scheme.

The first question in the present case is whether the futility issue is for the court or the jury. The Court of Appeals reasoned that futility is the kind of question so intertwined with "arcane legal principles that, for policy reasons, [it] must remain within the province of the court." *Estate of Friedman v. Pierce Cy.,* 51 Wn. App. 176, 182, 752 P.2d 936 (1988). The landowners argue that the question whether resort to administrative remedies would be futile should be submitted to the jury. They maintain that a jury can easily assess the futility issue in light of the policies underlying the exhaustion doctrine.

We agree with the Court of Appeals that the question whether resort to administrative remedies would be futile is a question for the court and not for the jury.

We find persuasive the reasoning of the Ninth Circuit. That court held, in a case where substantive due process and equal protection challenges were made to land use regulations, that ripeness is a question for the court and not for the jury. *Herrington v. County of Sonoma,* 857 F.2d 567, 568 (9th Cir. 1988). The court in *Herrington* relied on *Kinzli v. Santa Cruz,* 818 F.2d 1449 (9th Cir. 1987), a case involving a regulatory takings challenge. In *Kinzli,* the court said that it reviewed de novo the district court's finding regarding ripeness. *Kinzli,* at 1453 n.4. The court in *Kinzli* in turn relied on *Assiniboine & Sioux Tribes v. Board of Oil & Gas Conserv.,* 792 F.2d 782, 787 (9th Cir. 1986), where the court said that it reviews de novo a district court's dismissal for lack of jurisdiction. *Assiniboine* involved the broader question of justiciability, one aspect being ripeness. Thus, the Ninth Circuit's ultimate conclusion appears to be that ripeness in the context of land use regulations is a question of whether the court will exercise its jurisdiction to reach the issues in a case, and that jurisdiction is a question for the court and not for the jury. *Cf. Leichtman v. Koons,* 527 A.2d 745 (D.C. 1987) (material issues of fact as to jurisdiction are for the court, not the jury).

Our case law is compatible with the Ninth Circuit's conclusion that ripeness is a question for the court in cases involving challenges to land use regulations. We have implicitly recognized that exhaustion and ripeness are related concepts in the land use area. In *Orion* I we concluded that the landowner had established that it would be futile to pursue administrative proceedings, and therefore the landowner was excused from exhausting administrative remedies before resorting to the courts. In *Orion Corp. v. State,* 109 Wn.2d 621, 747 P.2d 1062 (1987) (*Orion II*), *cert. denied,* 108 S. Ct. 1996 (1988), we adhered to the holding in *Orion* I that factual futility excused exhaustion, and cast that holding in terms of ripeness. *Orion* II, at 631–33.

Thus, as a question whether the court will exercise its jurisdiction and reach the merits of a challenge to land use regulations where administrative remedies have not been exhausted, we conclude that the question is one for the court. Moreover, we think that referring this preliminary matter to the jury in a regulatory takings challenge, as in this case, would have the potential for confusing jurors who would have to decide whether resort to existing administrative proceedings is futile and impractical, independently of whether a regulation results in an unconstitutional taking. Finally, we note that a number of courts have held in varying contexts that certain matters, even though requiring resolution of factual questions, are for the court and not the jury. *See, e.g., Cheek v. Cicero Smith Lumber Co.,* 197 Okla. 505, 172 P.2d 991 (1946) (court decides issues of fact respecting collateral matters not going to the merits of the controversy between the parties); *American Employers' Ins. Co. v. Crawford,* 87 N.M. 375, 533 P.2d 1203 (1975) (court determines questions of law, including legal sufficiency of an asserted claim; facts must show legally recognized and enforceable claim); *Miller v. Stout,* 706 S.W.2d 785 (Tex. Ct. App. 1986) (right to jury trial does not extend to preliminary procedures not involving the question of liability; litigation would be interminably

prolonged if issues of fact arising in connection with preliminary motions and motions not involving the merits must be determined by the jury).

We hold that the question whether resort to administrative remedies is futile, as a result of either legal or factual conditions, is a question for the court and not for the jury.

We disagree with the Court of Appeals second holding—that a landowner must show by uncontroverted evidence that the pursuit of administrative remedies would be futile. This is an exceedingly high, virtually impossible burden of proof. The Court of Appeals quoted language from *Orion* I where this court recited the fact that the "trial court denied the defendants' motion [for summary judgment], holding that Orion had proven conclusively, by uncontroverted facts, that pursuing the available administrative procedures would be futile and impractical." *Orion* I, at 443, *quoted in Estate of Friedman,* at 180. By no means does this language indicate that a landowner must establish by uncontroverted evidence that resort to administrative proceedings would be futile. Rather, by that language we merely described the status of the record in that case.

The Court of Appeals also analogized the necessary showing to that required in defamation cases, where First Amendment concerns are involved. The Court of Appeals focus on a heightened burden of proof misapprehends the issue, however. It is not the quantum of proof nor the nature of the proof which enhances the landowner's burden. Rather, it is what the landowner has to prove and the stringent nature of the principles militating against factual futility which impose a difficult burden.

■ Once the defendant in a regulatory takings case raises as a defense the landowner's failure to exhaust administrative remedies, a landowner seeking to establish futility as an exception to the exhaustion requirement must persuade the court that futility excuses exhaustion. The landowner's burden is necessarily a substantial one for two reasons: first, the policies favoring the doctrine of exhausting administrative remedies, and, second, the necessity in

the usual regulatory takings case of showing deprivation of all or substantially all economic use of the land.[1]

The first of these reasons is well established in our cases. The strong bias in favor of the exhaustion doctrine exists in light of the policies underlying it:

> [T]o (1) insure against premature interruption of the administrative process, (2) allow the agency to develop the necessary factual background on which to base a decision, (3) allow the exercise of agency expertise, (4) provide a more efficient process and allow the agency to correct its own mistake, and (5) insure that individuals are not encouraged to ignore administrative procedures by resort to the courts.

*Orion* I, at 456–57 (citing *South Hollywood Hills Citizens Ass'n v. King Cy.*, 101 Wn.2d 68, 74, 677 P.2d 114 (1984)). This quotation of *Orion* I is not simply repetition of a jingoistic formula. Each of these policy underpinnings to the exhaustion doctrine is significant in and of itself, and, together, they mandate observance of the exhaustion requirement absent compelling ground for excuse.

The second reason that a landowner in an inverse condemnation claim has a substantial burden when seeking to establish futility is at least as important as the first. An inverse condemnation claim is difficult to assess where administrative procedures have not been exhausted.

> Unlike eminent domain proceedings where the government actually acquires fee title, land use regulations only limit actual or potential use and enjoyment of private property. Consequently, when land use ordinances are challenged, courts must ascertain the remaining value of the regulated property to determine the amount of economic impact caused by the regulation. This is done

---

[1]To establish a regulatory takings claim, the landowners must show either that the open space designation does not substantially advance a legitimate governmental purpose, or that it caused a sufficiently significant economic deprivation. *Agins v. Tiburon*, 447 U.S. 255, 260, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980); *Orion* II, at 663. In this case there is no allegation that the open space designation does not advance a legitimate governmental purpose. Thus, this case involves the usual challenge in inverse condemnation claims—that zoning regulations have resulted in economic deprivation.

largely by determining what remaining use of the property the ordinance permits. If substantial use remains, the amount of diminution in value or the effect upon the reasonable investment–backed expectations of the landowner are normally not significant enough to warrant a takings judgment. If, on the other hand, nearly all uses are depleted, a taking under the fifth amendment may exist.

(Footnote omitted.) Comment, *Land Use Takings and the Problem of Ripeness in the United States Supreme Court Cases,* 1 B.Y.U. J. Pub. L. 375, 381–82 (1987).

In short, a final governmental decision as to permitted uses of the land is generally a condition precedent to resolution of an inverse condemnation claim. As the United States Supreme Court has stated, "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cy. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 87 L. Ed. 2d 126, 105 S. Ct. 3108 (1985). The requirement of a final decision is compelled by the nature of the inquiry required when a regulatory taking is alleged:

[T]his Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment–backed expectations. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question.

(Citations omitted.) *Williamson Cy.,* at 191. The Court has said: "Our cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 351, 91 L. Ed. 2d 285, 106 S. Ct. 2561 (1986).

On several occasions the United States Supreme Court has found the required final decision lacking where plat applications were not made, or where variances were not sought. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 69 L. Ed. 2d 1, 101 S. Ct. 2352 (1981) (appellees failed to seek a variance or waiver from surface mining restrictions; pre–enforcement takings claim not ripe); *Agins v. Tiburon,* 447 U.S. 255, 65 L. Ed. 2d 106, 100 S. Ct. 2138 (1980) (property owners had not submitted a plan for development of their property; takings claim not ripe); *Williamson Cy.* (variances not sought; takings claim not ripe). In *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 96 L. Ed. 2d 250, 262–63, 107 S. Ct. 2378 (1987), by contrast, the Court found a compensation claim ripe where the California court had already determined that the landowner's allegations of a taking were sufficient to reach the question whether damages were available.

Courts cannot address inverse condemnation claims in a vacuum. They must be able to ascertain the remaining value of the regulated property. This necessity underlies the requirement of finality of governmental action. Concepts of finality, ripeness, and exhaustion tend to overlap in this area, yet it is apparent that this State's exhaustion requirement is entirely consistent with notions of finality and ripeness as those terms are used in federal inverse condemnation analysis. The exhaustion doctrine tends to assure that some final governmental determination as to use has been made, thus facilitating resolution of the question whether land use regulations so deprive the land of economic viability as to amount to a taking.

Therefore, it will be the uncommon case where a landowner can show a taking in the absence of exhausting available procedures in an attempt to secure a permit for possible use. In *Orion* I we made this quite clear: factual futility will be found only rarely and on unusual facts. Generally speaking, if a plat application, application for a conditional use permit or variance, or other administrative

procedure could result in a decision resulting in beneficial use of the land, factual futility should not be found. Whether factual futility exists must necessarily depend upon case–by–case analysis.

Contrary to the landowners' assertions, this case is not of the same ilk as *Orion* I and II. What little about the applicable zoning regulations and the other circumstances of this case is revealed by this record illustrates that the factual circumstances of this case are a far cry from those chronicled in *Orion* I. The Court of Appeals quite correctly concluded that "[t]he evidence in this record, such as it is, on the futility issue shows no more than a general belief of some Pierce County officials that the land in question should remain undeveloped." *Estate of Friedman v. Pierce Cy.,* 51 Wn. App. 176, 181, 752 P.2d 936 (1988). The record shows that the county officials are willing to consider proposals consistent with the overall PUD and consistent with the environmentally sensitive nature of the land. Thus, as the courts below concluded, the takings claim is premature.

Without knowing the exact nature of the zoning controlling the property, that is, uses contemplated by the overall PUD plan, and not simply the "open space" designation applied to this specific land, we will not speculate about what the County would do with an application consistent with the overall PUD plan and consistent with the nature of the area.

Moreover, it may be that the parties have placed too little emphasis on the location of the land as being within a PUD. PUD's in general have been approved by this court. *Lutz v. Longview,* 83 Wn.2d 566, 520 P.2d 1374 (1974). A PUD achieves flexibility by permitting specific modifications of the usual zoning standards as applied to a particular parcel. *Lutz,* at 568. One benefit of the PUD is that "buildings may be clustered in the most advantageous locations while environmentally fragile areas and natural amenities are left undeveloped. . . . Large open areas useful for natural amenity and active and passive recreation can be retained without sacrificing developing intensity." R.

Settle, *Washington Land Use and Environmental Law and Practice* § 2.12(c), at 68 (1983). The character of the zoning applicable to PUD's is significant: "[A PUD] permits the developer of a qualifying site to be dispensed from otherwise applicable zoning regulations in exchange for submitting to detailed, tailored regulation. The developer gains choice; the public gains precise control." R. Settle § 2.12(c), at 68.

Accordingly, one acquiring land within a PUD must be aware that the land is subject to controls consistent with the entire PUD. Thus, not only the original developer, but anyone acquiring land within the PUD at a later time should not expect that land use decisions will be made considering only a particular parcel within the PUD.

Although we readily acknowledge that the record is simply inadequate to decide the matter, not to mention that the parties have not addressed it, there is an apparent issue whether landowners who acquire land in an existing PUD may thereafter proceed in an inverse condemnation action based either on zoning regulations in place at the time the property was acquired, or on zoning regulations thereafter applied to previously undesignated land.

Finally, we briefly comment on one other matter. It is unclear what property is affected by our decision, in light of WSLA's abandonment of the appeal upon the petition for review and the uncertain status of Venture's interest in WSLA's property. If WSLA's property is not involved in our review, does Venture as an option holder have standing to claim damages for a taking when WSLA is bound by a judgment below that its takings claim is premature? We will not resolve this question, but its existence serves to highlight the recurring difficulty in this case—an inadequate record.

We affirm the Court of Appeals decision that the takings claim is premature.

UTTER, DOLLIVER, DORE, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., and HAMILTON, J. Pro Tem., concur.